UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| PAMELA EILENFELDT, as next friend of her minor child, J.M., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 4:12-cv-04029-SLD-JEH |
| UNITED C.U.S.D. #304 BOARD OF EDUCATION, a Political Subdivision of the State of Illinois; JEFF WHITSITT, an individual; KRISTEN NELSON, an individual; RYAN WESTART, an individual; LORI SCHROCK, an individual; DONNA WINBIGLER, an individual; DENNIS BROWN, an individual; and DOES I-XX, inclusive, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER

Plaintiff Pamela Eilenfeldt brings this action on behalf of her son J.M., claiming he was continuously bullied and harassed when he was in the seventh and eighth grades at United Junior High School in Monmouth, Illinois.  Eilenfeldt alleges that Defendants enabled and, in some instances, encouraged students to bully and harass J.M.  Before the Court are several motions filed by Defendants:  a Motion for Direction from the Court in Regards to March 25, 2014 Order, ECF No. 32, a Motion to Dismiss the Second Amended Complaint, ECF No. 36, a Motion For Leave to File a Memorandum in Support Motion to Dismiss in Excess of the Page Limit, ECF No. 37, and a Motion to Supplement Case Law in Support of Motion to Dismiss Second Amended Complaint, ECF No. 40.  For the following reasons, the motion for direction is

1

MOOT, the motion to dismiss is GRANTED IN PART and DENIED IN PART, the motion

seeking leave to file extra pages is GRANTED, and the Motion to Supplement is DENIED.

## BACKGROUND[1]

### I.    Parties

Eilenfeldt brings this action on behalf of her minor child J.M. against various individuals

and entities associated with the United Community Unit School District #304 ("C.U.S.D." or

"School District").  Eilenfeldt asserts that Defendants acted under color of law and makes her

claims against each individual Defendant in his or her individual capacity.  Defendants' identities

are as follows:

1. Defendant C.U.S.D. (the "School District") is a political subdivision of the State of
   Illinois and operates United Junior High School, a public educational institution located
   in Monmouth, Illinois.

2. Defendant Jeff Whitsitt is the superintendent of schools for the School District.

3. Defendant Kristen Nelson is the principal of United Junior High School.

4. Defendants Ryan Westart, Lori Schrock, and Donna Winbigler are teachers at United
   Junior High School.

5. Defendant Dennis Brown is a guidance counselor at United Junior High School.

6. The true names and capacities of Defendants Doe I-XX[2] are unknown to Eilenfeldt.
   Eilenfeldt is informed and thereon alleges that each Defendant designated as Doe is

---

[1] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff.  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted).  Accordingly, the material set forth here is, unless otherwise noted, based on allegations in the Second Amended Complaint, ECF No. 33.
[2] Eilenfeldt references "Does I-XX" in the caption of her Amended Complaint, but at other points she refers to "Does I-X."  Because the caption names Does I-XX, the Court will use that designation to refer to them.

responsible in some manner for the events referred to in this action and proximately caused J.M.'s injuries.

## II.    Bullying and Harassment of J.M.

Various students at United Junior High School began bullying and harassing J.M. in January 2011 when he was a seventh-grader.  The bullying and harassment continued through the end of that academic year and into the following academic year when J.M. was an eighth grader.  During this period, students bullied J.M. by, among other things, taunting, teasing, pushing, punching, and kicking him.  Except for one instance of bullying, School District officials and United Junior High School administrators and teachers never investigated complaints that J.M. had been bullied or punished a student for bullying J.M.  To the contrary, administrators and teachers facilitated ongoing bullying of J.M. by failing to stop the bullying, actively encouraging bullying, and punishing J.M. for defending himself while being bullied.

The bullying began in January, 2011 when "T1.," "P.," and "D1." (presumably other students, though Eilenfeldt does not make this clear) repeatedly shoved J.M. in the hallways and inappropriately touched him in the locker room.  Eilenfeldt immediately reported this conduct to three of J.M.'s teachers, Westart, Winbigler, and a Mr. Noonan.[3]  Despite the report, J.M.'s teachers did not investigate the incidents or punish the students who were involved.  When responding to the complaints, Winbigler said that J.M. "brought some of this on himself."

These initial incidents were just the beginning of the bullying.  Students verbally taunted J.M by calling him a rapist, pedophile, and child molester and suggesting that he was sexually attracted to young boys.   In addition to the verbal bullying, students produced pictures, graffiti artwork, and videos depicting J.M. as a pedophile and child molester.  Students also continued to physically bully J.M.  For instance, students kicked, punched, and pushed J.M.  One student even

---

[3] Noonan is not one of the Defendants.

threatened to "shank" J.M. with a knife. While the student who threatened to "shank" J.M. was suspended for two weeks, none of the other students who bullied J.M. were punished. Eilenfeldt alleges that when J.M. tried to stand up for himself, J.M. was punished but the bullies were not.

Eilenfeldt continued to report instances of bullying to Principal Nelson and J.M.'s teachers, but almost nothing resulted from these complaints. Instead, they usually blamed J.M. for the bullying. For example, Winbigler said that J.M. "gives back about as much as he gets" and that he just "needs to stay away from certain kids" and "learn how to make life easier for himself." In another example, Eilenfeldt complained to Principal Nelson that it was difficult for J.M. to focus on learning because students had been calling him sexually perverted names, repeatedly punching him in the head, and kicking him in the legs. Principal Nelson responded that the bullying was J.M.'s fault and punished him by assigning him a seat on the school bus.

The bullying and harassment continued into the next school year when J.M. was in the eighth grade. Eilenfeldt continued complaining to school administrators and teachers, but they did not do anything to stop the bullying. Instead, their conduct facilitated more bullying. For example, a Ms. Kopriva gave J.M. detention for telling two bullies that he was not a rapist after those students had called him a rapist in her classroom.

Eventually, in October, 2011, Eilenfeldt spoke with Superintendant Whitsitt because school administrators and teachers were not doing anything to prevent students from bullying and harassing J.M. But Superintendant Whitsitt did not take any action to address Eilenfeldt's complaints. After speaking with Whitsitt, Eilenfeldt met with Principal Nelson and Guidance Counselor Brown to discuss the ongoing bullying and harassment. One topic of discussion was the school's punishment of the student who threatened to stab J.M. with a knife. Eilenfeldt had two concerns regarding this incident. First, Eilenfeldt was concerned because it was the only

instance that the school had punished any student for bullying J.M. Second, the school only punished the student by suspending him for two weeks instead of expelling him for one year and reporting the incident to authorities, both of which are required under the student handbook. Despite these meetings, Superintendant Whitsitt, Principal Nelson, and Guidance Couneslor Brown took no action to address Eilenfeldt's concerns.

The bullying and harassment continued after Eilenfeldt met with various school and School District employees. Again, administrators and teachers refrained from punishing the bullies. Instead, they punished J.M. even though he was the one being bullied. In one of Westart's classes, J.M. tried to defend himself from bullies. Following the altercation, Westart asked the class whether J.M. should be punished by having to write out the preamble to the United States Constitution twenty-five times, and the class agreed to impose the punishment. A few days later, unidentified school administrators and teachers, with the knowledge that J.M. had been recently bullied, commended unspecified eighth graders for being the "best group of kids."

The bullying continued into December 2011, and January 2012. One student showed to the rest of his classmates an image of a man standing next to a van and looking at children. This student told his classmates that the man was J.M. and that J.M. was going to rape the children. Students also continued to repeatedly shove J.M. in the hallways. One of the students that pushed J.M. in the hallways also sang a song about how J.M. was going to rape him. When J.M. reported this conduct to Schrock, she took no action. Instead, Schrock scolded J.M. for asking the bully to sing the song to her and told him that it was his fault that the bully sang the song. Later that day, Eilenfeldt complained about the incident to Principal Nelson, but she took no action.

One of J.M.'s doctors treated J.M. for school-avoidance anxiety disorder caused by verbal and physical bullying and harassment at school. The doctor recommended that it was in J.M.'s best interest not to return to school until the school addressed his safety and well-being. Eilenfeldt, on behalf of J.M., makes various claims against the School District, Superintendent Whitsitt, Principal Nelson, Guidance Counselor Brown, and teachers Westart, Schrock, and Winbigler. These are discussed in more detail below.

## III. Procedural History

Plaintiff first filed suit on March 20, 2012, ECF No. 1. The Court granted Defendants' Motion to Dismiss, ECF No. 11, and gave Plaintiff leave to refile, ECF No. 23. Plaintiff did so on April 23, 2013, ECF No. 24. Another motion to dismiss followed, ECF No. 25, which the Court granted in part and denied in part, ECF No. 31, giving Plaintiff leave once more to amend. When an amended complaint was not forthcoming, Defendants filed their Motion for Direction from the Court in Regards to March 25, 2014 Order, ECF No. 32, which asked to Court to dismiss the Amended Complaint. On April 29, 2014, Plaintiff filed a second amended complaint. Yet another motion to dismiss followed, ECF No. 36, and is now before the Court, along with a memorandum of points and authorities styled, because of its length, a motion for leave to file a memorandum in excess of the page limit, ECF No. 37. Defendants also filed a motion with two cases attached, ECF No. 40, which they wished to bring to the Court's attention.

## DISCUSSION

## I. Motion to Dismiss Standard

A motion to dismiss under Rule 12(b)(6) does not resolve the merits of a particular claim. Instead, it tests only the sufficiency of the allegations set forth in the complaint. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a). A court will accept the factual allegations in the complaint as true, but they must give "'fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). In sum, the plaintiff's allegations must demonstrate that the claim "is plausible, rather than merely speculative." *Tomayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In ruling on a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). Facts in the complaint that disprove the asserted claim should be considered, and the court need not accept unsupported conclusions of law. *N. Ind. Gun & Outdoor Shows v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009) (citing *Twombly*, 550 U.S. 544 (2007)) (conclusory allegations are "not entitled to be assumed true").

## II.     Defendants' Motion to Dismiss the Second Amended Complaint

Eilenfeldt's Second Amended Complaint has shed many of its original causes of action, and now contains only four: (I), a Title IX claim for sexual harassment and sexual discrimination, Second Am. Compl. 10–12; (II), a § 1983 *Monell* claim alleging that the School had a *de facto* policy that deprived J.M. of his rights to equal protection and substantive due

process, *id.* at 12–13; (III), a § 1983 claim of substantive due process violations as to all school-employee defendants, *id.* at 13–14; and (IV), a § 1983 "class of one" claim of equal protection violations as to all school-employee defendants, *id.* at 14–15. Defendants move to dismiss the Second Amended Complaint on the grounds that Counts I, III, and IV fail to state a claim upon which relief can be granted, and that Count II confusingly pleads more than one cause of action. The Court will treat the arguments against each Count sequentially.

### A.    Title IX Claims

Defendants argue that Plaintiff fails to state a claim under Title IX because she does not allege discrimination on the basis of gender. Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In certain circumstances, an individual who suffers student-on-student sexual harassment has a private right of action against the recipient of federal funding. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). To succeed on a Title IX peer harassment claim, a plaintiff must show, among other things, that "the funding recipient act[ed] with deliberate indifference to known acts of harassment in its programs or activities," and that the harassment was "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. The harassment must be 'on the basis of sex,' meaning the harassment was motivated by either the plaintiff's gender or failure to conform to gender norms. *See Corral v. UNO Charter Sch. Network, Inc.*, No. 10-cv-03379, 2013 WL 1855824, at *5 (N.D. Ill. May 1, 2013) ("[H]arassment based solely upon a person's sexual preference or orientation (and not on one's sex or conformity to gender norms) is not a basis for a sex discrimination claim."); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081,

1086 (7th Cir. 1984) ("Members of Congress have, moreover, on a number of occasions, attempted to amend Title VII to prohibit discrimination based upon 'affectional or sexual orientation.' Each of these attempts has failed."); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (holding discrimination on the basis of sex and gender violative of Title VII).

The Court previously dismissed Plaintiff's Title IX claim with leave to refile, explaining that Eilenfeldt had not alleged any harassment against J.M. "*because* of his male gender or his failure to conform to male gender norms." Mar. 25, 2014 Order 10 (original emphasis). The Court observed that while other children were alleged to have called J.M. a rapist, pedophile, and child molester, and stated that he was attracted to young boys, this behavior merely related to "deviant sexual conduct," and was not focused on his male gender. *Id.* Although Plaintiff has re-alleged her Title IX claim, Defendants argue that she has added nothing to her original allegations but a conclusory statement that J.M. was discriminated against because he "did not conform to gender norms," Second Am. Compl. ¶ 50.

Plaintiff has indeed not modified her First Amended Complaint beyond the statement that those who bullied J.M. did so because they believed he did not conform to gender norms. The bullying J.M. allegedly suffered took the form of the repeated, cruel suggestion that J.M had sexual urges of which he ought to be ashamed, and for which he ought to be punished. As reprehensible as such taunting may have been, it took the form of an absurd and baseless accusation meant to wound. It did not, at least on the allegations before the Court today, begin with some observable feature of J.M.'s gender or gendered behavior. J.M. was not harassed for being male, or being insufficiently male; indeed, it is unclear from the pleadings why he was harassed. As tragic as the alleged abuse might be, the fact that it apparently arose from nothing more nor less than schoolyard cruelty and near-arbitrary animosity takes it well outside the realm

of Title IX gender discrimination. Courts have repeatedly held that forms of abuse utilizing gendered or sexual language do not, by their use of such language alone, constitute discrimination on the basis of gender. *See Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 931 (C.D. Ill. 2002) ("the use of terms such as 'bitch,' 'whore' and 'slut' at school are not necessarily based upon gender bias but may be based on personal animosity unrelated to gender"); *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996) (abrogated on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)) ("'sick bitch'—and, we add, the other verbal abuse, and [an] obscene gesture . . . was, in context, not a sex- or gender-related term").

The Court previously found Plaintiff's allegations insufficient to support her Title IX claim. It again finds the allegations insufficient, and now dismisses Count I, Plaintiff's Title IX claim, because she has failed to state a claim upon which relief could be granted.

**B.     § 1983 *Monell* Claims**

To state a claim under § 1983, a plaintiff must allege that (1) some individual deprived her of a federally protected right; and (2) the individual who deprived her of that right acted under color of state law. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 459 (7th Cir. 2007) (per curiam).

However, a plaintiff may also sue a municipality or municipal entity under § 1983 "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To hold a municipal or county entity liable under § 1983 for an official custom or policy, a plaintiff must allege that: (1) the municipality "had an express policy that, when enforced, causes a constitutional deprivation;" (2) the

municipality "had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law;" or (3) his "constitutional injury was caused by a person with final policymaking authority." *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

The School District argues that Plaintiff pleads two separate theories of *Monell* liability under a single Count—a due process claim and an equal protection claim. Mem. Supp. Mot. Dismiss 2nd Am. Compl. 7. The School District points to the Court's Order granting leave to amend the Complaint a second time, in which the Court warned Plaintiff against grouping together multiple causes of action in individual counts because such confusing aggregation violated Federal Rules of Civil Procedure 8(a) and 10(b). Mar. 25, 2014 Order 8–9. In that Order, the Court noted that "[l]imiting each cause of action to a single claim would greatly improve clarity," and warned Plaintiff that repeated failure to cure deficiencies in a complaint might result in dismissal with prejudice. *Id.* at 8.

The Court's earlier without-prejudice dismissal of Plaintiff's *Monell* claim, however, was premised not on how confusing the claim was, but on Plaintiff's impermissible request for punitive damages against the School. Mar. 25, 2014 Order at 12. Plaintiff has now cured that deficiency, seeking compensatory damages. 2nd Am. Compl. ¶ 61. While the Court found that some of the aggregated causes of action in the First Amended Complaint were confusing, the finding was with specific reference to Counts lodged against "all defendants," because these Counts made it "difficult for Defendants and the Court to determine which allegations against which Defendants are the basis for certain causes of action." *Id.* at 9. By contrast, in ruling on Plaintiff's *Monell* claim, lodged against only the School, the Court found that "Eilenfeldt has

pleaded sufficient facts to allow Defendants, and the Court, to understand the gravamen of her complaint." *Id.* at 12.

It would indeed have promoted clarity to separate the equal protection and due process causes of action from each other, as the Court repeatedly suggested Plaintiff might wish to do. However, doing so in this instance would not have promoted clarity much. Plaintiff alleges that the School District violated both J.M.'s due process and equal protection rights. 2nd Am. Compl. ¶ 60. Separating these two causes of action into two claims would not provide the School District with any more information about the claims against it than it currently possess. Defendant argues that "[e]ach claim requires a separate set of facts to be set forth." Mem. Supp. Mot. Dismiss 2nd Am. Compl. 7. However, allegations in support of each claim are made both in Count II and the Counts that follow. Recall that a *Monell* violation requires not just a policy or practice, but an actual violation of a plaintiff's civil rights under § 1983. Almost invariably, the rights violations alleged in the *Monell* violation are those also alleged against particular agents of the municipal entity in question, who are also being sued in their individual capacity. *See Medina v. City of Chicago*, 100 F. Supp. 2d 893, 894–96 (N.D. Ill. 2000) (explaining that *Monell* claims tend to rise and fall with the personal liability claims lodged against state officers). That is true in the instant case.

However, Count II's close association with the equal protection allegations listed in Count IV also proves to be the downfall of the equal protection side of the *Monell* claim. For if, as explained above, the due process and equal protection *Monell* claims rest entirely upon the Fourteenth Amendment violations alleged as to specific actors, then if no claim has been made out that those actors violated Plaintiff's civil rights, the *Monell* claim as to the school must fail too. And in this case, as explained in Section D, *infra*, Plaintiff cannot sustain her equal

protection claims. Thus, only one *Monell* claim of the two originally embedded in the second Count remains—the due process allegation. Thus too, with only one claim remaining, any uncertainty about the content of the claims in Count II that Defendants may have had is remedied.

Count II is dismissed insofar as it is a claim for relief under the equal protection clause of the Fourteenth Amendment. The motion is denied, and the Count remains, insofar as it is a claim for relief against the School under the due process clause of the Fourteenth Amendment.

### C.      § 1983 Substantive Due Process Claims

Defendants argue that Plaintiff's due process claims as to all employee-defendants fail because failures to act are not actionable under the due process clause, and none of the behavior alleged shocks the conscience. "No State shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const., Amdt. 14, § 1. A state action taken by the executive branch violates due process only when it "'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992)). Although the "shocks the conscience" standard "lacks precise measurement," it "points toward 'the tort law's spectrum of liability.'" *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 818-19 (7th Cir. 2007) (quoting *Cnty. of Sacramento*, 523 U.S. at 847–48 ). "Only conduct falling toward the more culpable end of the spectrum shall be found to shock the conscience." *King*, 496 F.3d at 819.

Normally, only government action may violate a person's due process rights, because the government has no duty to act affirmatively to protect people from the actions of third parties. *See Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 596 (7th Cir. 2008)

("There is no federal constitutional right to be protected by the government against private violence in which the government is not complicit."). However, under certain very limited circumstances, the state may nevertheless be held liable for a failure to protect. The state may owe a duty to protect someone with whom it has a "special relationship" by virtue of having placed that person in custody; it may also owe such a duty to someone whom the state itself has placed in danger. *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). The so-called "state created danger doctrine" requires:

> First, in order for the Due Process Clause to impose upon a state the duty to protect its citizens, the state, by its affirmative acts, must create or increase a danger faced by an individual . . . . Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual . . . Third, because the right to protection against state-created dangers is derived from the substantive component of the Due Process Clause, the state's failure to protect the individual must shock the conscience.

*King*, 496 F.3d at 817–18 (citations omitted). The Seventh Circuit has sometimes disapproved the distinction between cases involving state action and inaction coupled with a duty to protect, reasoning that "in both classes of case the victim is safe before the state intervenes and unsafe afterward." *Sandage*, 548 F.3d 595. In other words, even what looks like culpable state inaction in the face of a duty to protect can be viewed as merely the result of an affirmative state action that placed someone in a vulnerable position. But regardless of whether the state has affirmatively acted, or merely created a danger, a state actor must have behaved in a way that shocks the conscience for a due process violation to occur.[4]

Defendants lodge two objections to Plaintiff's substantive due process claim. One is that a failure to act is "not actionable" under substantive due process. Mem. Supp. Mot. Dismiss 2nd

---

[4] This is arguably not the case in "special relationship" situations. However, a special relationship is only created when "the State takes a person into its custody and holds him there against his will." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). As Plaintiff acknowledges, she is not proceeding on a special relationship theory for her due process claim. Resp. Mot. Dismiss Second Am. Compl. 7.

Am. Compl. 11. This is false. A government failure to act is "actionable" if a special relationship has been created between government and victim, or if the state created the danger that now threatens the victim. *Monfils*, 165 F.3d at 516. Viewed differently, an original state action (creating a danger, placing someone in a position of diminished ability to care for himself) then creates a threat to a victim, in light of which the state's failure to act is constitutionally deficient. *Sandage*, 548 F.3d 595. Thus, Defendants' numerous observations that, at times, they seem to have allegedly misbehaved only by inaction do not, in themselves, supply any reason to dismiss the claim. *See* Mem. Supp. Mot. Dismiss 2nd Am. Compl. 13–17.

Defendants' second objection is that none of the conduct alleged "shocks the conscience," as it must for a substantive due process violation by the executive branch, whether by state action or state created danger. *Id.* at 9. However, as the Court observed in its previous Order, whether certain conduct shocks the conscience is "a necessarily fact-bound inquiry," and not appropriately decided, on these facts, at the motion-to-dismiss stage. Mar. 25, 2014 Order at 13 (citing *King*, 496 F.3d at 818). Defendants argue with respect to each individual defendant, that none of their actions shocks the conscience. Mem. Supp. Mot. Dismiss 2nd Am. Compl. 13–17. Courts may not, however, dismiss § 1983 claims under Federal Rule of Civil Procedure 12(b)(6) merely "for lack of factual specificity"; plaintiffs "need not allege all, or any of the facts logically entailed by the claim . . . A plaintiff does not have to plead evidence." *McCormick*, 230 F.3d at 325 (internal quotation marks omitted). Rather, his "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The factual allegations in Plaintiff's Complaint do so, and the Court will not evaluate them as if they were evidence, or treat this motion on the pleadings as if it were a motion for summary judgment. Plaintiff has alleged sufficient plausible facts for the Court to infer that the alleged offense could

have been committed, and in particular, that Defendants' actions could have been conscience-shocking. Defendants' motion to dismiss as to Plaintiff's substantive due process claims, Count III, is denied.

### D.    § 1983 Equal Protection Claims

Defendants argue that Plaintiff's equal protection claims as to all employee-defendants fail because Plaintiff does not allege that the defendants acted without a rational basis. Mem. Supp. Mot. Dismiss 2nd Am. Compl. 19. The Fourteenth Amendment's Equal Protection Clause is typically "understood as protecting members of vulnerable groups from unequal treatment attributable to the state," but the clause "also proscribes state action that irrationally singles out and targets an individual for discriminatory treatment as a so-called 'class-of-one.'" *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)). The elements of a class-of-one claim—and what a plaintiff must plead in the complaint to state such a claim—are not fully settled in this Circuit. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc) (5-5 division resulting in no controlling opinion), *cert. denied*, 133 S. Ct. 654 (2012). "[A]t a minimum," the claim "would require proof that the defendants intentionally treated [a plaintiff] differently from others situated similarly to [him or] her for no rational reason," *Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 254 (7th Cir. 2012)), and it is unclear whether plaintiffs must also show improper motive, or "illegitimate animus," to successfully prove the claim, *see Thayer*, 705 F.3d at 254.

In any event, it is clear that the bar for a class-of-one equal protection claim is high. If there is a "*conceivable* rational basis for the difference in treatment" suffered by the class member, then the claim fails. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013)

(cert. denied, 134 S. Ct. 1308 (2014)) (original emphasis); *see Heller v. Doe by Doe*, 509 U.S.

312, 320 (1993) (explaining that, under rational basis review in an equal protection challenge, "a

classification 'must be upheld against equal protection challenge if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification.'") (quoting

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The burden lies with the plaintiff to

"overcome the presumption of rationality attached to government action." *Flying J Inc. v. City

of New Haven*, 549 F.3d 538, 545 (7th Cir. 2008). It is for this reason that animus, improper

motive, and other factors that cast doubt on a possible rational basis are frequently pleaded. *See

Del Marcelle*, 680 F.3d at 913 (Wood, J., dissenting) ("[these factors are] illustrative of the kind

of facts on which a plaintiff might rely in a complaint to show that the lack of a rational basis is

not merely possible, but plausible").

In this case, there are conceivable rational bases for the actions of each individual

defendant described in the Second Amended Complaint. In each case, Plaintiff does nothing to

diminish the plausibility of these bases. The defendants are treated sequentially below, and the

facts taken from the allegations in the complaint, read in the light most favorable to the Plaintiff.

Ryan Westart, a teacher, took no action upon being informed by Plaintiff that J.M. had

been assaulted by bullies, Second Am. Compl. ¶ 21, and asked his class whether J.M. should be

punished by writing out the preamble of the U.S. Constitution 25 times for attempting to defend

himself from bullies, *id.* at ¶ 34. Westart then made J.M. sit in a desk adjoining his own, away

from the other students. *Id.* Plaintiff argues that "[t]he decisions of Westart to retaliate against

J.M. and to single him out from the rest of the class and bully J.M. as a result of J.M. reporting

the harassment and bullying conduct by his classmates against him cannot be rationally related to

any legitimate government interest." Resp. Mot. Dismiss 2nd Am. Compl.13, ECF No. 39.

However, Plaintiff pleads no facts beyond those listed above to suggest that Westart might have lacked a rational basis. As Defendants observe with respect to each one of the employee-defendants, Westart may well have had a legitimate pedagogical reason for not taking action against the bullies, or punishing J.M. by making him write the constitution and sit in a separate desk. Without more facts alleged, Plaintiff's characterization of that behavior as, itself, "bullying" is spurious, and fails to overcome the presumption of rationality that applies to state action.

Donna Winbigler, a teacher, took no action when the bullying of J.M. was reported to her, ¶ 21, and told J.M.'s mother that J.M. "runs his mouth" and "gives back about as much as he gets," ¶ 24. Plaintiff describes these alleged acts as constituting retaliation and bullying. Resp. Mot. Dismiss 2nd Am. Compl.12. However, this is an inaccurate characterization of the acts and omissions attributed to Winbigler by the Second Amended Complaint. All Winbigler is alleged to have done was decline to punish the bullies after being told of their activities and report on J.M.'s behavior to Plaintiff. Decisions about whether or not to impose discipline on students, taken by an individual teacher, are surely within that teacher's pedagogical discretion. And, as Defendants observe, the two quoted statements made in a conversation with Plaintiff about J.M.'s behavior are not suggestive or constitutive of an irrational basis for singling J.M. out—as, indeed, they are not suggestive or constitutive of singling out J.M. at all. Plaintiff has not overcome the presumption of rationality as to Winbigler's actions.

Lori Schrock,[5] a teacher, took no punitive action when told that a student had made up a song about J.M. raping him, told J.M. she was sure it was not inappropriate, and scolded J.M. for asking the student to sing it to her. Second Am. Compl. ¶ 38. Plaintiff describes this behavior as

---

[5] Schrock's name is spelled "Shrock" in the caption to the Second Amended Complaint, "Shrock" in Defendant's Motion to Dismiss the Second Amended Complaint, and "Schrok" in Plaintiff's Motion in Opposition. The Court uses the caption's version here.

having no rational basis entirely, it appears, because of Plaintiff's own description of that behavior as inexplicable. On the contrary, one can imagine several legitimate explanations relating to pedagogy and student discipline for why Schrock might have scolded J.M. and not punished the bully. Plaintiff has not overcome the presumption of rationality as to Schrock's actions.

Dennis Brown, a guidance counselor, and Jeff Whitsitt, the Superintendent of Schools, failed to address some of Plaintiff's complaints upon meeting with her in October 2011. Second Am. Compl. ¶¶ 30, 31. However, Brown and Whitsitt could have had many legitimate reasons for their perceived failure to address Plaintiff's complaints. They might have preferred to allow teachers to address disciplinary issues at the classroom level; they might have reasonably construed Plaintiff's concerns to be excessive. One might multiply examples, and Plaintiff suggests no reason why not. Plaintiff has not overcome the presumption of rationality as to Brown or Whitsitt.

Kristen Nelson, school principal, was informed that J.M. had been punched by another student, *id.* ¶ 25, and assigned J.M. a seat on the school bus in response, saying that it was his fault, ¶ 27. Nelson, like Brown and Whitsitt, was at the October 2011 meeting after which no action was taken. *Id.* ¶¶ 30, 31. Nelson received a letter from Plaintiff on December 5, 2011, detailing the bullying, and one student's threat to stab J.M, *id.* ¶¶ 32, 33.[6] In response, Nelson said that the school might have an assembly to address bullying, *id.* ¶ 34. Nelson later congratulated the eighth grade as a class for being the "best group of kids." *Id.* ¶ 35. Nelson was informed on January 17, 2012, of a bullying incident where students had shown a picture on a computer to other students, saying that it depicted J.M. about to rape children. *Id.* ¶ 36. Nelson

---

[6] The Second Amended Complaint does concede, ¶ 30, that certain students were disciplined—allegedly insufficiently—for bringing knives to school.

was also informed that on January 19, 2012, J.M. had been shoved by bullies in the hallway. *Id.* ¶ 37. She took no action in response to either event. When told that a student had sung a derogatory song about J.M., Nelson took no action but said: "we are working hard to keep J.M. from hurting J.M." *Id.* ¶ 38. While in their aggregate, these are more troubling than the allegations lodged against the other teachers, the Court finds that they do not plausibly preclude a "*conceivable* rational basis for the difference in treatment" J.M. may have experienced. *Kopp*, 725 F.3d at 686 (original emphasis). In particular, the Court notes that Plaintiff's repeated claims that Nelson never took any action are contradicted by her statement that staff were "working hard to keep J.M. from hurting J.M." However one interprets this statement, it suggests that Nelson was acting in the way that she did with a pedagogical or disciplinary aim in view. Whether or not those actions were shocking to the conscience is a question to be determined under Plaintiff's due process claim. But Plaintiff's complaint does not make a showing that Nelson had no rational basis for her actions.

Plaintiff's equal protection claim fails, as to all employee-defendants, to show that there was no "*conceivable* rational basis for the difference in treatment" suffered by J.M. *Kopp*, 725 F.3d at 686. Defendants' motion to dismiss is granted as to Plaintiff's equal protection claims, Count IV.

## CONCLUSION

Accordingly, Defendants' Motion for Direction from the Court, ECF No. 32, is MOOT, the Motion to Dismiss, ECF No. 36, is GRANTED IN PART and DENIED IN PART, the Motion for Leave to File Memorandum in Excess of Page Limitation is GRANTED, and the Motion to Supplement is DENIED.

Entered this 25th day of March, 2015.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE
