UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| PAMELA EILENFELDT, as next friend of her minor child, J.M., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 4:12-cv-04029-SLD-JEH<br>)<br>) |
| UNITED C.U.S.D. #304 BOARD OF EDUCATION, a Political Subdivision of the State of Illinois; JEFF WHITSITT, an individual; KRISTEN NELSON, an individual; RYAN WESTART, an individual; LORI SCHROCK, an individual; DONNA WINBIGLER, an individual; DENNIS BROWN, an individual; and DOES I-XX, inclusive, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

ORDER

Plaintiff Pamela Eilendfeldt, on behalf of her minor son J.M, is suing Defendant United C.U.S.D. ("the school district"), teachers and a counselor, the school's superintendent (Jeff Whitsitt), and the school's principal (Kristen Nelson), on the basis of bullying that was allegedly directed at J.M. over the course of 2011, while he was a student. While Eilenfeldt initially sued under several legal theories, the only ones that remain are a substantive due process claim against the individual defendants and a *Monell* claim against the school district, both pursuant to 42 U.S.C. § 1983. Second Am. Compl. 12–14, ECF No. 33. Now before the Court are Defendants' motion for summary judgment as to Count III of the second amended complaint, ECF No. 48, containing the claims against the individual defendants; Defendants' motion to supplement that motion with additional case law, ECF No. 56, and Defendants' second motion to supplement

1

with case law, ECF No. 58. For the following reasons, the motions are GRANTED, and Count III is DISMISSED.

## BACKGROUND[1]

### I. Parties

Eilenfeldt brings this action on behalf of her minor child J.M. against various individuals and entities associated with the United Community Unit School District #304. Eilenfeldt asserts that Defendants acted under color of law and makes her claims against each individual Defendant in his or her individual capacity. Defendants' identities are as follows:

1. Defendant C.U.S.D. is a political subdivision of the State of Illinois and operates United Junior High School, a public educational institution located in Monmouth, Illinois.

2. Defendant Jeff Whitsitt is the superintendent of schools for the School District.

3. Defendant Kristen Nelson is the principal of United Junior High School.

4. Defendants Ryan Westart, Lori Schrock, and Donna Winbigler are teachers at United Junior High School.

5. Defendant Dennis Brown is a guidance counselor at United Junior High School.

6. The true names and capacities of Defendants Doe I-XX are unknown to Eilenfeldt. Eilenfeldt is informed and thereon alleges that each Defendant designated as Doe is responsible in some manner for the events referred to in this action and proximately caused J.M.'s injuries.

---

[1] The facts recounted here are taken from Defendants' undisputed material facts, Mem. Supp. Mot. Summ. J. 3–6, ECF No. 49, and Plaintiff's Second Amended Complaint. Plaintiff failed to comply with Local Rule 7.1(D)(2)(b), in that she did not respond to Defendants' undisputed material facts. This may be because Defendants concede the truth of Plaintiffs' allegations for the purpose of the summary judgment motion. *See* Mem. Supp. Mot. Summ. J. 3 n.2. Defendants purport to have drawn from Plaintiffs' Second Amended Complaint. The Court, accordingly, draws from both. All facts are recounted and construed in the light most favorable to Plaintiff, the non-moving party. See *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## II.   Bullying and Harassment of J.M.

Various students at United Junior High School began bullying and harassing J.M. in January 2011 when he was a seventh-grader. The bullying and harassment continued through the end of that academic year and into the following academic year when J.M. was an eighth grader. During this period, students bullied J.M. by, among other things, taunting, teasing, pushing, punching, and kicking him.

The bullying began in January, 2011 when "T1.," "P.," and "D1." (presumably other students, though Eilenfeldt does not make this clear) repeatedly shoved J.M. in the hallways and inappropriately touched him in the locker room. Eilenfeldt immediately reported this conduct to three of J.M.'s teachers, Westart, Winbigler, and a Mr. Noonan.[2] Despite the report, J.M.'s teachers did not investigate the incidents or punish the students who were involved. When responding to the complaints, Winbigler said that J.M. "brought some of this on himself."

These initial incidents were just the beginning of the bullying. Students verbally taunted J.M by calling him a rapist, pedophile, and child molester and suggesting that he was sexually attracted to young boys. In addition to the verbal bullying, students produced pictures, graffiti artwork, and videos depicting J.M. as a pedophile and child molester. Students also continued to physically bully J.M. For instance, students kicked, punched, and pushed J.M. One student even threatened to "shank" J.M. with a knife. While the student who threatened to "shank" J.M. was suspended for two weeks, none of the other students who bullied J.M. were punished. When J.M. tried to stand up for himself, J.M. was punished but the bullies were not.

Eilenfeldt continued to report instances of bullying to Principal Nelson and J.M.'s teachers, but almost nothing resulted from these complaints. Instead, the staff usually blamed J.M. for the bullying. For example, Winbigler said that J.M. "gives back about as much as he

---

[2] Noonan is not one of the Defendants.

gets" and that he just "needs to stay away from certain kids" and "learn how to make life easier for himself." In another example, Eilenfeldt complained to Principal Nelson that it was difficult for J.M. to focus on learning because students had been calling him sexually perverted names, repeatedly punching him in the head, and kicking him in the legs. Principal Nelson responded that the bullying was J.M.'s fault and punished him by assigning him a seat on the school bus.

The bullying and harassment continued into the next school year when J.M. was in the eighth grade. Eilenfeldt continued complaining to school administrators and teachers, but they did not do anything to stop the bullying. Instead, their conduct facilitated more bullying. For example, a Ms. Kopriva gave J.M. detention for telling two bullies that he was not a rapist after those students had called him a rapist in her classroom.

Eventually, in October, 2011, Eilenfeldt spoke with Superintendant Whitsitt because school administrators and teachers were not doing anything to prevent students from bullying and harassing J.M. But Superintendant Whitsitt did not take any action to address Eilenfeldt's complaints. After speaking with Whitsitt, Eilenfeldt met with Principal Nelson and Guidance Counselor Brown to discuss the ongoing bullying and harassment. One topic of discussion was the school's punishment of the student who threatened to stab J.M. with a knife. Eilenfeldt had two concerns regarding this incident. First, Eilenfeldt was concerned because it was the only instance that the school had punished any student for bullying J.M. Second, the school only punished the student by suspending him for two weeks instead of expelling him for one year and reporting the incident to authorities, both of which are required under the student handbook. Despite these meetings, Superintendant Whitsitt, Principal Nelson, and Guidance Couneslor Brown took no action to address Eilenfeldt's concerns.

4

The bullying and harassment continued after Eilenfeldt met with various school employees. Again, administrators and teachers refrained from punishing the bullies. Instead, they punished J.M. even though he was the one being bullied. In one of Westart's classes, J.M. tried to defend himself from bullies. Following the altercation, Westart asked the class whether J.M. should be punished by having to write out the preamble to the United States Constitution twenty-five times, and the class agreed to impose the punishment. A few days later, unidentified school administrators and teachers, with the knowledge that J.M. had been recently bullied, commended unspecified eighth graders for being the "best group of kids."

The bullying continued into December 2011, and January 2012. One student showed to the rest of his classmates an image of a man standing next to a van and looking at children. This student told his classmates that the man was J.M. and that J.M. was going to rape the children. Students also continued to repeatedly shove J.M. in the hallways. One of the students that pushed J.M. in the hallways also sang a song about how J.M. was going to rape him. When J.M. reported this conduct to Schrock, she took no action. Instead, Schrock scolded J.M. for asking the bully to sing the song to her and told him that it was his fault that the bully sang the song. Later that day, Eilenfeldt complained about the incident to Principal Nelson, but she took no action.

One of J.M.'s doctors treated J.M. for school-avoidance anxiety disorder caused by verbal and physical bullying and harassment at school. The doctor recommended that it was in J.M.'s best interest not to return to school until the school addressed his safety and well-being.

### III. Procedural History

Plaintiff first filed suit on March 20, 2012, ECF No. 1. The Court granted Defendants' Motion to Dismiss, ECF No. 11, and gave Plaintiff leave to refile, March 25, 2013 Order, ECF

5

No. 23.  Plaintiff did so on April 12, 2013, ECF No. 24.  Again, a motion to dismiss followed, ECF No. 25, which the Court granted in part and denied in part, March 25, 2014 Order, ECF No. 31, giving Plaintiff leave once more to amend.  Plaintiff once more amended, ECF No. 33, and once more, Defendants moved to dismiss, ECF No. 36.  The Court granted this motion in part and denied it in part, March 25, 2015 Order, ECF No. 41, leaving only part of Count II of Plaintiff's *Monell* claim against the school district, and Count III, the substantive due process charges against the individual defendants.[3]  The case proceeded to discovery, but Defendants moved for summary judgment on grounds of qualified immunity, as well as, later, for consideration by the Court of two cases claimed to be pertinent to the motion for summary judgment.  The Court now turns to the motion for summary judmgent.

## DISCUSSION

**I.      Legal Standard**

**A.      Legal Standard on a Motion for Summary Judgment**

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[3] The "Third Cause of Action" in the Amended Complaint, ECF No. 33, styles itself a substantive due process claim against "all defendants"; however, the Court and the parties treated it as if it was against the individual defendants, since the defendant school district was already accounted for in a separate count, namely, Count II, the *Monell* claim alleging substantive due process violations.  Municipal entities cannot be liable under § 1983 except via a discriminatory policy or pattern of behavior, as supplied in *Monell*.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  Thus, the only remaining claims after the Court's March 25, 2015 Order were claims of rights violations by individual actors, summed in the substantive due process claims found in Count III, and the claim of rights violations by the school district, represented by the substantive due process *Monell* claim in Count II.

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

      **B.**    **Substantive Due Process and Failure to Protect**

In order for a defendant to be liable under 42 U.S.C. § 1983, he "must first possess power by virtue of state law, then *misuse* that power in a way that violates federal constitutional rights." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994). The Fourteenth Amendment to the Constitution of the United States provides, *inter alia*, that state governments shall not "deprive any person of life, liberty, or property, without due process of law . . . ." Individuals possess rights to both "procedural" and "substantive" due process, the latter of which "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

Substantive due process generally prohibits certain state actions, rather than requiring that actions be taken to protect individuals. Two exceptions are recognized—when the state creates a "special relationship" with an individual by incarceration or otherwise restraining his ability to protect and care for himself, *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir.1998); and the so-called "state-created danger exception," when a state actor's conduct "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that they

7

otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.1993). To make out a substantive due process claim under the state-created danger exception, a plaintiff must show that "(1) that the state . . . by its affirmative acts, created or increased a danger that [Plaintiff] faced; (2) that [the state's] failure to protect [Plaintiff] from danger was the proximate cause of [his] injury; and (3) that [the state's] failure to protect [Plaintiff] shocks the conscience." *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015).

    C.    **Qualified Immunity**

The doctrine of qualified immunity protects government officials from civil liability for their actions in the course of their duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It is designed to shield government agents from liability when they perform their duties reasonably in light of extant law, even where a plaintiff's rights are violated. *Id.* Thus, "in order to defeat a properly raised qualified immunity defense, the plaintiff must establish two things: first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct." *Gerhartz v. Richert*, 779 F.3d 682, 688 (7th Cir. 2015) *cert. denied*, 136 S. Ct. 319 (2015). Depending on the exigencies of the particular case, a court may answer the questions in either order, and need not answer both if one proves to be dispositive. *Pearson*, 555 U.S. at 236. In order to determine from case law whether a constitutional right was clearly established, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A defendant entitled to qualified immunity is "not merely entitled to a defense from liability; he is entitled not to stand trial." *Leaf v. Shelnutt*, 400 F.3d 1070, 1080 (7th Cir. 2005). "Because of the significant policies served by qualified immunity, a court should determine early in the proceedings whether qualified immunity will apply." *Id.* at 1079 n.7.

**II.    Analysis**

Defendants assert that qualified immunity applies to all individual defendants, arguing both that no violations of J.M.'s right to substantive due process occurred, Mem. Supp. Mot. Summ. J. 7–13, and that even if they did, no clearly established law put Defendants on notice that their actions violated any of J.M.'s constitutional rights, *id.* at 14–24.[4] Plaintiff responds that insufficient discovery—that is to say, no discovery[5]—has occurred for the Court to determine that J.M.'s constitutional rights were not violated, Resp. Mot. Summ. J. 35, ECF No. 51, and that J.M.'s violated rights were clearly established, *id.* at 7–9.

There is no dispute that all individual defendants are public officials, who during the conduct alleged were performing discretionary functions, and thus entitled to raise the defense of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). The Court thus proceeds to the two elements of the qualified immunity defense.

Defendants argue many already-raised theories in support of their claim that, on Plaintiff's alleged facts, no violation of J.M.'s constitutional rights occurred, and thus, Eilenfeldt's claim fails on the first prong of the qualified immunity defense. As Plaintiff observes, however, the Court has previously ruled that "Eilenfeldt has adequately alleged that Defendants acted arbitrarily and that their actions were not rationally related to a legitimate

---

[4] The school district's institutional liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) is not addressed by Defendants' motion for summary judgment, except impliedly.

[5] The Court stayed discovery until the instant motion is ruled on. *See* Sept. 4, 2015 Order, ECF No. 57.

government interest," Mar. 25, 2014 Order 13, and that whether Defendants' actions were, in context, conscience-shocking is a "fact-bound inquiry that, in this case, is not appropriately decided at the motion-to-dismiss stage," *id.* Since Defendants' motion for summary judgment accepts as true all the facts in Plaintiff's second amended complaint, the Court's earlier ruling that these facts were sufficient to survive a motion to dismiss was a ruling on the same facts that Defendants now argue. Their motion for summary judgment is, as to the first element of qualified immunity, akin to a motion to reconsider.

The Court is, of course, entitled to alter its non-final rulings and judgments. Fed. R. Civ. P. 54(b). However, the Court is again unpersuaded. Defendants' chief argument is that no fundamental interest of J.M.'s was allegedly violated. Mem. Supp. Mot. Summ. J. 7–13. Defendants argue that there is no fundamental right to education, and that while there is a fundamental right to liberty, the harms visited on J.M. were not sufficient to implicate it. *Id.* However, "[a] person holds a liberty interest in his or her own physical safety." *Buchanan-Moore v. City of Milwaukee*, 576 F. Supp. 2d 944, 950 (E.D. Wis. 2008). While Defendants are correct that many of the harms J.M. suffered may not in and of themselves have qualified as threats to his safety, some of them did (for instance, the student who threatened to "shank" him and subsequently brought a knife to school). While the connection between such threats of harm and school officials is not clear at this phase, since there has been no discovery, it is not possible to determine that no reasonable jury could find the school and its officials had deprived J.M. of a liberty interest in his physical safety. Thus, on the basis of the factual record as thus far developed, Defendants are not entitled to qualified immunity on the basis of there having been no constitutional violation.

10

However, once a claim of qualified immunity has been raised, a plaintiff also bears the burden of demonstrating the violation of a clearly established constitutional right of which a reasonable person would have known. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). To do so, she must point to case law that "place[s] the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. at 741. But Plaintiff does not argue that Defendants violated any of J.M.'s clearly established constitutional rights, or point to analogous case law. Instead, Plaintiff merely notes that Court's March 25, 2015 Order explained how a substantive due process claim could be made out on the facts alleged in the complaint. Resp. Mot. Summ. J. 8–9. This is insufficient. However, Plaintiff's failure to cite case law "is not fatal by itself because [the Court] must determine qualified immunity in light of all relevant precedents—both those cited by the parties and those" the Court discovers itself. *Kernats*, 35 F.3d at 1177.

Existing case law presenting analogous situations suggests that educators in Defendants' position do not violate a clearly established right when they behave as these defendants allegedly did. *D.S. v. East Porter County School Corp.*, 799 F.3d 793 (7th Cir. 2015), cited by Defendants in their first supplemental motion, is instructive. D.S. was subjected to bullying at school. Bullies threw basketballs at her head and tripped her during practice; someone wrote in her school planner "I hope you die"; she was often segregated from other students by being moved to a special desk in the corner of class, which students would kick as they walked by. *Id.* at 796. Guidance counselors and teachers did little or nothing to prevent the behavior, instead sometimes allegedly participating in it by making D.S. play basketball with broken toes, or not giving her enough playing time. *Id.* After an altercation between D.S.'s parents and some bullies, D.S.'s parents were banned from campus, and their complaints were not acted on. *Id.* at 797. The district court found, and the Seventh Circuit affirmed, that D.S.'s constitutional rights had not

11

been violated under the state-created danger exception. The Seventh Circuit explained that these acts of student misbehavior, coupled with apparent indifference or passive collusion on the part of teachers and administrators, failed to rise to a rights violation because the defendants did not instigate, create, or increase the bullying she faced, and even if they had, their behavior would not have risen to the "requisite level of egregiousness" to shock the conscience. *Id.* at 798–99.

Admittedly, the *D.S.* court had the benefit of testimonial material adduced in discovery. *See D.S. v. E. Porter Cty. Sch. Corp.*, No. 2:11-CV-431-PRC, 2013 WL 1827402, at *5 (N.D. Ind. Apr. 29, 2013) aff'd, 799 F.3d 793 (7th Cir. 2015). Although the district court concluded on the basis of this testimony both that the school had not caused D.S.'s harm, and that its failure to prevent that harm was not conscience-shocking, and there has been no testimony or discovery here, the similarity of the factual situations shows that no *clearly established* right to be free of such behavior exists. That is, if teachers who neglected to stop bullying and at times seem to have been indifferent to or encouraged it could be found not liable for a constitutional violation of substantive due process under Section 1983, all the less can it be so that very similarly situated actors, whether or not their behavior was in fact egregious enough to shock the conscience, can have been on notice that their behavior violated a clearly established constitutional right. And in order to overcome qualified immunity, Plaintiff must show at this stage that their behavior did violate a right of which reasonable actors would have known, as established by existing precedent. *Ashcroft v. al–Kidd*, 563 at 741. Existing precedent suggests that under similar circumstances on at least one occasion, no right has been found to exist; thus, it cannot be that the right was clearly established. The individual defendants are all entitled to prevail under the qualified immunity defense.

With Defendants' motion granted, only the *Monell* claim against the school district for violations of substantive due process remains. Effectively, Plaintiff is being allowed to pursue the claim that the teachers and other personnel at J.M.'s school violated his constitutional rights and, while they are entitled to qualified immunity for any such violation, the school district is not; and furthermore, that the alleged violations arose out of the execution of a policy or custom. *See Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980) (municipal entity not entitled to qualified immunity); *Elrod v. City of Chicago*, No. 06 C 2505, 2007 WL 3241352, at *4 (N.D. Ill. Nov. 1, 2007) ("In some cases the assertion of a defense of qualified immunity. . . raises the potential scenario in which a plaintiff who proves a constitutional violation loses his claim against the individual defendant because of the defense of qualified immunity, but could prevail against the City under Monell[.]").

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment Based on Qualified Immunity, ECF No. 48, is GRANTED, as are their two motions to supplement that motion, ECF Nos. 56, 58. Count III of Plaintiff's Second Amended Complaint, ECF No. 33, is DISMISSED.

Entered this 14th day of February, 2016.

                                                                           s/ Sara Darrow
                                                                          SARA DARROW
                                                     UNITED STATES DISTRICT JUDGE